REVISED OCTOBER 15, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 99-20449

---

JAMES M. NATHENSON, on behalf of
himself and all others similarly situated;
DSAM GLOBAL VALUE FUND LTD; JONATHAN
MARGALIT; AMIT SANGHVI; JIANBO XIE;
JOHN DEROSA; ROBERT STRASSMAN;
DEAN HAGEN; ARNO HAUSMANN,

                                        Plaintiffs-Appellants,

        versus


ZONAGEN INC; ET AL,

                                        Defendants,


ZONAGEN INC; JOSEPH PODOLSKI;
STEVEN BLASNIK; M SUTTER,

                                        Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Texas, Houston

---

September 25, 2001

Before GARWOOD, DeMOSS, and PARKER, Circuit Judges.

GARWOOD, Circuit Judge:

        Plaintiffs-appellants James Nathenson and others (collectively, the

plaintiffs) filed this putative class action in the court below against

defendants-appellants Zonagen, Inc. (Zonagen), Zonagen chief executive

officer and director Joseph Podolski (Podolski) and Zonagen outside directors and major shareholders Steven Blasnik (Blasnik) and Martin Sutter (Sutter) (collectively, the defendants). In their complaint, the plaintiffs sought class certification and alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act) and Rule 10b-5 of the Securities Exchange Commission (SEC). The defendants moved to dismiss the complaint under FED. R. CIV. P. 12(b)(6). The district court granted the motion in a memorandum opinion and in a separate document rendered judgment that "this action is dismissed with prejudice." The plaintiffs now appeal. Finding sufficient merit in one of plaintiffs' complaints on appeal, we vacate and remand.

## Facts and Proceedings Below

This is a private securities fraud action brought by nine putative class representatives on behalf of purchasers of common stock in Zonagen, a biopharmaceutical company based in The Woodlands, Texas. The plaintiffs allege that during the class period,[1] February 7, 1996, through January 9, 1998, the defendants–Zonagen, its president and CEO, Podolski, and two of its outside directors and major shareholders, Blasnik and Sutter, the latter being Chairman of the Board, engaged in a scheme to defraud their shareholders by issuing a series of public misrepresentations

---

[1] In their Consolidated Amended Complaint, the plaintiffs sought class certification under FED. R. CIV. P. 23. However, the district court granted the defendants' motion to dismiss before ruling on the certification issue. Despite the absence of certification, we will, for clarity's sake, refer to the time in question as the "class period."

2

about two of Zonagen's potential products in order to inflate artificially the value of Zonagen's stock and sell $67.5 million in stock in July 1997 at an inflated price. The two potential products in question are "Vasomax," an oral treatment for male erectile dysfunction (MED), and "Immumax," an adjuvant[2] for the delivery of animal and human vaccines.

In order to market a drug in the United States, developers must first obtain the approval of the Food and Drug Administration (FDA). This approval process involves, among other things, conducting a series of clinical trials to establish the safety and efficacy of the drug. The maker of the drug then submits the results of these trials to the FDA as part of its New Drug Application (NDA). Phase I trials test the safety, dosage tolerance, and other pharmacokinetic properties of the drug; they also identify the primary side-effects, if any, that the drug may cause. During Phase II trials, researchers test the drug in a limited patient population to gather information about efficacy, optimal dosage levels, adverse effects, and safety risks. Phase III trials test the efficacy and safety of the drug in an expanded patient population at geographically dispersed trial sites.

The broad contours of the events in question are as follows.

_____

[2] An adjuvant a is foreign substance that improves a given immune response in the body by enhancing the effect of a particular antigen, which is a substance that stimulates the production of antibodies. *See* STEDMAN'S MEDICAL DICTIONARY 29 (Marjory Spraycar ed., 26th ed. 1995).

In 1995, Zonagen completed its Phase I trials for Vasomax in Ireland and reported the results of these trials in a Form 10-K filed with the SEC that year. The company then initiated Phase II trials in Germany; these trials concluded in March 1996. On February 7, 1996, the first day of the class period, Zonagen shares traded at $12 3/8. On February 7 and 14, 1996, before the completion of the Phase II trials, two news items appeared in which Podolski indicated that the "preliminary" results of the Phase II trials were positive. Similar statements were made to analysts on March 5 and in a March 14, 1996 press release (similar statements were also made in Zonagen's April 1, 1996 10K for the year ended December 31, 1995). The stock traded at $16 a share on March 13, 1996. On May 9 and 16, 1996, Zonagen issued press releases that described the Phase II results in positive terms, the May 9 release unmistakably implying and the May 16 release expressly stating that the Phase II trials produced statistically significant results. As the district court noted, Zonagen shares after March 13, 1996 "fell steadily until reaching . . . less than $10 per share in early August."

In press releases, as well as in its public filings with the SEC, Zonagen represented not only that the Phase II trials had positive results, but also that Zonagen had acquired the rights to a "method of use" patent, known as the Zorgniotti patent, which covered the administration of phentolamine, the active ingredient

4

in Vasomax. In addition, Zonagen used its press releases and public filings of 1996-97 to state its belief that it had "discovered" a "new" adjuvant, which it called Immumax.

In November 1996, Zonagen began Phase III trials for Vasomax in the United States. Soon after, Zonagen began issuing press releases discussing these trials and expressing its hope that the results would enable Zonagen to file an NDA by June 1997. In its public filings with the SEC, it made similar statements about the Phase III trials in the United States. On November 14, 1996, Zonagen filed a Form S-3 with the SEC in connection with the proposed sale by some of its shareholders of Zonagen shares not previously publicly offered. In the Form S-3, Zonagen disclosed that the Phase II trials had not yielded statistically significant results and that the other patent (the Lowrey patent) it had hoped would cover Vasomax had been rejected in a non-final first office action by the United States Patent and Trademark Office.

In 1997, Zonagen's press releases and public filings noted the positive results of the Phase III trials. On June 11, 1997, Zonagen filed a Form S-3 with the SEC seeking registration of two million shares of Zonagen stock for sale by the company. The Form S-3 stated that the Phase III trials had yielded statistically significant results, and also discussed the "discovery" of Immumax and the Zorgniotti patent respecting Vasomax. On June 13, 1997, Zonagen issued a press release announcing the successful completion

5

of its Phase III trials. On May 23, 1997, the last day of trading before the announcement, the price per share of Zonagen stock was $17d. On May 27, the day of the announcement, the price per share rose to $24½. On July 18, 1997, after no further announcements, Zonagen's share price closed at $32¼. On July 22, 1997, Zonagen filed a prospectus with the SEC which commenced its secondary offering of common stock. In a press release issued that same day, the company announced that it had raised $67.5 million in gross proceeds from the sale of 2.25 million shares sold at a price of $30 per share. Zonagen shares rendered a high of 44 3/8 on October 13, 1997. On January 12, 1998, the Monday following January 9, 1998, the last day of the class period, the stock closed at 13 15/16. The average closing price of Zonagen shares in the ninety days following the last day of the class period (January 9, 1998 through April 10, 1998) was $20 1/5. On June 2, 1998, the stock traded at $36 3/4 per share; by June 12, 1998, it had fallen to $24 3/4 per share.[3]

On June 19, 1998, the plaintiffs filed their Consolidated Amended Complaint (complaint) seeking class certification and

---

[3]The above stated information as to share prices comes from the amended complaint and its attachments. Defendants also furnished the district court with a list covering all trading days from March 25, 1993 through July 30, 1998 showing the Zonagen high ask, low bid and close bid prices and volume each day. The accuracy of that information has not been questioned.

alleging that the defendants had violated section 10(b)[4] of the 1934 Act and Rule 10b-5[5] promulgated thereunder by the SEC (an original complaint was filed March 9, 1998). The plaintiffs also contended that the three individual defendants were liable as "controlling persons" under section 20(a)[6] of the 1934 Act. As noted above, the complaint primarily charges that the defendants made a series of misrepresentations about their Vasomax and Immumax potential products in order to artificially inflate the company's share price, and then sold a large amount of stock at an inflated

---

[4] Section 10(b) provides in relevant part:

"It shall be unlawful for any person, directly or indirectly . . .

(b) To use or employ, in connection with the purchase or sale of any security . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

[5] Rule 10b-5 provides in relevant part:

"It shall be unlawful for any person, directly or indirectly . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

[6] Section 20(a) of the 1934 Act provides in relevant part:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

7

price.   On August 3, 1998, the defendants moved to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6).   On March 31, 1999, the district court granted the motion and dismissed the "action" with prejudice.   The plaintiffs now appeal.

## Discussion

On appeal, the plaintiffs maintain that the district court erred in dismissing their complaint.

This Court reviews a district court's dismissal under Rule 12(b)(6) *de novo*. *See Rubenstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994). In doing so, we will accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiffs. *See id.* (citing *Scheuer v. Rhodes*, 94 S.Ct. 1683, 1686 (1974)).

## I.   Private Securities Litigation Reform Act

As a preliminary matter, we note that this case presents us with the occasion to apply the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. 104-67, 109 Stat. 737 (December 22, 1995), which Congress passed to prevent the abuse of federal securities laws by private plaintiffs.   The statute purports to increase the pleading requirement for plaintiffs alleging section 10(b)/Rule 10b-5 claims.

### A.   "Strong" Inference of Scienter

In order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the

8

purchase or sale of securities, "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) (quotation omitted). Before the passage of the PSLRA, the Courts of Appeals had not reached a consensus regarding the nature and content of the allegations of scienter that a plaintiff must plead in order to survive a motion to dismiss. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 (11th Cir. 1999). Interpreting FED. R. CIV. P. 9(b), which requires plaintiffs alleging fraud to plead "with particularity" the circumstances supporting their allegations, the Second Circuit held that securities fraud plaintiffs must allege specific facts giving rise to a "strong inference" of scienter, while the Ninth Circuit allowed plaintiffs to plead scienter generally. *See id.* (citing cases). At that time, the Second Circuit's "strong inference" test was the most stringent among the Courts of Appeals. This Court also required plaintiffs to plead specific facts, but unlike the Second Circuit, only mandated that the specific facts alleged "support an inference of fraud." *See Tuchman*, 14 F.3d at 1068.

Unsatisfied with the disagreement among the Circuits, as well as the perceived inability of Rule 9(b) to prevent abusive, frivolous strike suits, Congress in 1995 passed the PSLRA over the President's veto. *See* H.R. Conf. Rep. No. 104-369, at 41 (1995),

9

*reprinted in* 1995 U.S.C.C.A.N. 730, 740.  The PSLRA amended the 1934 Act to provide in relevant part:

> "In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

The PSLRA also provides that if a plaintiff does not meet this requirement, the district court "shall," on defendant's motion, "dismiss the complaint."  *See id.* § 78u-4(b)(3).

The plain language of the statute makes clear that our previous rule, which required that a plaintiff plead facts that merely "support an inference of fraud," has been supplanted by the PSLRA's "strong inference" requirement.  We therefore find that in order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a "strong inference" of scienter.

B.  Severe Recklessness as a "Required State of Mind" Post-PSLRA

The PSLRA leaves undefined, however, the content of the scienter requirement, that is, "the required state of mind" necessary to allege a private securities fraud claim.  The absence of direct guidance on this point, coupled with the statute's stated purpose of winnowing out meritless claims by imposing more stringent pleading requirements on plaintiffs, has raised in the

10

minds of some the possibility that the PSLRA may have eliminated the lesser mental state of recklessness as a basis for liability. Based on the language of the statute, we conclude that the PSLRA does not purport to, and does not, speak to or address the state of mind generally required to impose liability under section 10(b) and Rule 10b-5, and hence, with certain specific exceptions, does not itself eliminate the possibility that recklessness may suffice. Accordingly, and apart from those below noted specific instances where the matter is addressed by the PSLRA, whether recklessness suffices for such purpose is governed by our pre-PSLRA jurisprudence.

In *Ernst & Ernst v. Hochfelder*, 96 S.Ct. 1375, 1381 n.12 (1976), the Supreme Court defined scienter for purposes of securities fraud cases as "a mental state embracing intent to deceive, manipulate, or defraud." The Court left open the question whether scienter included recklessness. *See id.*[7] Since that time, and prior to the PSLRA, the Courts of Appeals, including this Court, have held that recklessness does satisfy the scienter requirement. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir. 1990); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir. 1989); *Van Dyke v. Coburn Enter. Inc.*, 873 F.2d 1094, 1100 (8th Cir. 1989); *McDonald v. Alan Bush Brokerage*

---

[7] The Court made it clear, however, that negligence alone is insufficient to support liability. *See id.* at 1384.

11

*Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *Hackbart v. Holmes*, 675 F.2d 1114, 1117-18 (10th Cir. 1982); *Broad v. Rockwell*, 642 F.2d 929, 961-62 (5th Cir. 1981) (*en banc*); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023-24 (6th Cir. 1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978); *Sundstrand Corp. v. Sun Chem Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977).

Adopting the definition first announced in *Sundstrand*, this Court and other Courts of Appeals have conceived of recklessness in this context as "severe recklessness," which, "properly defined and adequately distinguished from mere negligence," resembles a slightly lesser species of intentional misconduct. *See Broad*, 642 F.2d at 961. This Court defined recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* at 961-62.

It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b-5, and therefore severe recklessness, as defined in *Broad*, remains a basis for such liability. The First, Third, Sixth, and Eleventh Circuits have all explicitly reached similar conclusions. *See Greebel v. FTP Software, Inc.*, 194 F.3d

12

185, 198-201 (1st Cir. 1999); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548-49 (6th Cir. 1999); *Bryant*, 187 F.3d at 1283-84.[8] The Second Circuit has implicitly so concluded as well. *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (observing that the scienter requirement for securities fraud claims, which includes recklessness, "has been firmly established for at least a generation" and that the PSLRA altered the "procedural" requirements for bringing such a claim); *see also Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (describing substantive recklessness standard).  The Ninth Circuit has reached the slightly different conclusion that, at least under the PSLRA, recklessness suffices to meet the substantive scienter requirement *only* if it rises to the level of "deliberate recklessness." *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975-77 (9th Cir.), *reh'g and reh'g en banc denied*, 195 F.3d 521 (9th Cir. 1999).

As the Third Circuit has pointed out, the PSLRA characterizes the requirements of section 78u-4(b)(2) as a "pleading requirement," not as a change to the substantive scienter requirement.  *See Advanta*, 180 F.3d at 534 (citing section 87u-

---

[8]    The Fourth Circuit has also apparently reached this conclusion, however obliquely. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir. 1999) ("Thus, to establish scienter, a plaintiff must still prove the defendant acted intentionally, which may perhaps be shown by recklessness.").

4(b)(3)).  The legislative history confirms this point and demonstrates that the floor debates, the committee reports from both houses of Congress, and the President's veto statement all describe the PSLRA as imposing "pleading" or "procedural" requirements.  *See id.; see also Greebel*, 194 F.3d at 200 (noting that neither the legislative history nor the language of the PSLRA evinces an intent to change the generally applicable substantive definition of scienter).  Further, as noted above, the PSLRA does not define the generally "required state of mind" for private securities fraud cases, but rather requires that a plaintiff plead facts giving rise to a "strong inference" of "the required" state of mind.

Moreover, Congress specified a substantive state of mind requirement elsewhere in the statute, in the statutory safe harbor provisions for "forward-looking statements" and joint and several liability.  *See* 15 U.S.C. § 78u-5(c)(1)(B) (creating safe harbor for such statements if plaintiff cannot demonstrate that they were made with "actual knowledge" that the statements were false or misleading at the time they were made); *id.* § 78u-4(f)(2)(A) (limiting joint and several liability to defendants whose action has been found to be "knowing").  "If Congress desired to require some other state of mind [for purposes of section 78u-4(b)(2)], that is, other than the reckless state of mind then uniformly held sufficient by the federal courts . . . Congress [could] have done

14

so in explicit terms" as it did with these provisions. *Bryant*, 187 F.3d at 1284; *see also Greebel*, 194 F.3d at 200 ("Congress, having explicitly eliminated recklessness as a basis for imposing joint and several liability, should not be taken as implicitly having eliminated recklessness as a basis for any liability.").

Accordingly, we join the First, Third, Sixth, and Eleventh Circuits and conclude that recklessness, the "severe recklessness" defined in *Broad,* still constitutes scienter for purposes of claims brought under section 10(b) and Rule 10b-5 (except as otherwise provided in the noted statutory safe harbor provisions respecting forward looking statements and joint and several liability).

C.  Pleading Requirement for Scienter Under the PSLRA

The next inquiry is what effect the PSLRA has on the patterns of facts that may be pleaded in order to create the "strong inference" of either intentional misconduct or severe recklessness. Before Congress passed the PSLRA, the Second Circuit announced two means by which a plaintiff could plead facts that would create a strong inference of scienter: the plaintiff could either (1) allege facts to show that a defendant had both motive and opportunity to commit fraud, or (2) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  This Court apparently adopted these two formulations as well, although for the former, we indicated that a plaintiff could

satisfy the scienter requirement at the pleading stage "by alleging facts that show a defendant's motive to commit securities fraud." *Tuchman*, 14 F.3d at 1068. During the passage of the PSLRA, there was considerable debate in Congress over whether the PSLRA effectively incorporated the prior Second Circuit methods for proving scienter or prohibits at least the use of the motive and opportunity method. *See Greebel*, 194 F.3d at 194. The parties address this debate as well, with the plaintiffs, and the SEC as amicus, arguing that the motive and opportunity method survived the passage of the PSLRA, and the defendants urging a more restrictive view. The district court did not decide this question because it concluded that the plaintiffs could not meet either method of pleading scienter.

There does not appear to be any question that under the PSLRA circumstantial evidence can support a strong inference of scienter. As the First Circuit has pointed out, "Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." *Greebel*, 194 F.3d at 195. The Courts of Appeals are divided, however, over the status of the motive and opportunity method. In *Silicon Graphics*, for example, the Ninth Circuit held that allegations of motive and opportunity could not create a strong inference of scienter sufficient to survive, at the pleadings state, a motion to dismiss. *Silicon Graphics*, 183 F.3d at 977-79.

16

The Second and Third Circuits have held that under the PSLRA a strong inference of scienter can be alleged by showing motive and opportunity, or circumstantial evidence of severe recklessness or conscious misconduct. *See Advanta*, 180 F.3d at 534-35; *Press v. Chemical Inv. Serv. Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999).[9]

The most sensible approach appears to us to be the one first generally articulated by the Sixth Circuit in *Comshare*. The *Comshare* Court held that scienter can be alleged by pleading facts giving rise to a strong inference of recklessness or conscious

_____

[9]We do not believe that our examination of this question is to any extent foreclosed by our opinion in *Williams v. WMX Technologics, Inc.*, 112 F.3d 175 (5th Cir. 1997). That was a case filed before, and not governed by, the PSLRA, in which we held that "the amended complaint failed to allege fraud with particularity." *Id*. at 176. The only reference to the PSLRA occurs at the end of the following paragraph, viz:

> "As the Second Circuit has noted, articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). We agree with the Second Circuit's approach. This suit was the Second Circuit's approach. This suit was filed prior to the effective date of the Private Securities Litigation Reform Act, and while its provisions do not apply, the Act adopted the same standard we apply today. *See* H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 41 (1995); 15 U.S.C. § 78u-4(b)."
> *Id*. at 177-78.

The statement that the PSLRA "adopted the same standards we apply today" is not only mere passing dicta but, in context, clearly is directed to the particularity requirement, with respect to specifying the allegedly misleading statements and what is misleading about them, which the PSLRA addresses in § 78u-4(b)(1), and not so much to the question of what circumstances can give rise to the necessary "strong" inference of the required state of mind as provided in § 78u-4(b)(2). The *Williams* opinion discusses only the lack of particularity in the pleading, and does not refer to motive and opportunity.

misconduct, but declined to hold that allegations of motive and opportunity, "standing alone," meet the pleading requirement. *See Comshare*, 183 F.3d at 551. The Court made the entirely accurate observation that "evidence of a defendant's motive and opportunity to commit securities fraud does not constitute 'scienter' for the purposes of [section] 10b or Rule 10b-5 liability." *Id.* Instead, the Court stated that motive and opportunity could be "relevant" to pleading scienter and "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *Id.* The Eleventh Circuit in *Bryant* noted its agreement with "the reasoning of the Sixth Circuit" in *Comshare*, and went on to state that "[w]hile allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter. . . . although motive and opportunity to commit fraud may under some circumstances contribute to an inference fo severe recklessness, we decline to conclude that they, standing alone, are its equivalent. . . . motive and opportunity are specific kinds of evidence, which, along with other evidence might contribute to an inference of recklessness or willfulness." *Bryant* at 1285-86. *See also id*. at 1287 (". . . a showing of mere motive and opportunity is insufficient to plead scienter"). In *Greebel* the First Circuit stated that its "view of the" PSLRA was "close to that articulated by the Sixth Circuit" in *Comshare*. *Greebel* at 197. The First

Circuit went on to say "[w]ithout adopting any pleading litany of motive and opportunity, we reject defendants' argument that facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter. But . . . merely pleading motive and opportunity, regardless of the strength of the inference to be drawn of scienter, is not enough." *Id.* More recently, the Second Circuit reached what it described as "a middle ground" in *Novak*, in which it concluded that Congress's "failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard" for demonstrating the required strong inference of scienter. *Novak* at 310.

The PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter. *See Greebel*, 194 F.3d at 195. The statute is silent on the question. While there was much debate in Congress over whether the PSLRA incorporated the motive and opportunity method, the "legislative history on this point is ambiguous and even contradictory." *Advanta*, 180 F.3d at 531. The only special standard that Congress established was raising the pleading requirement to a "strong" inference of scienter. *See Greebel*, 194 F.3d at 195-96. This standard may only be met on the basis of "facts" which are "state[d] with particularity" in the pleading. By otherwise leaving open the manner in which a plaintiff may raise a strong

19

inference of scienter, and not codifying the motive and opportunity method, Congress may be presumed to have to some extent left the matter to the courts. *See id.* at 195; *cf. Novak* at 311 ("Although litigants and lower courts need and should not employ or rely on magic words such as ‹motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the ‹strong inference' standard may be met.").

Therefore there is some merit in the First Circuit's observation that "the debate about adoption or rejection of prior Second Circuit standards" appears to be "somewhat beside the point." *See Greebel*, 194 F.3d at 196. Motive and opportunity is properly only an analytical device for assessing the logical strength of the inferences arising from particularized facts pled by a plaintiff to establish the necessary mental state. The PSLRA requires that the necessary strong inference of scienter must arise from "facts" stated in the complaint "with particularity" and, as *Greebel* observes, "whatever the characteristic pattern of the facts alleged, those facts must now present a *strong* inference of scienter." *Id*. at 196. The probative force of facts alleged ultimately depends on reason and experience, and in this respect guidance can properly be afforded by prior judicial decisions. *However*, resolving the question of the *degree* of probative value to be required *also* involves normative considerations. As the Second Circuit said in *Novak* regarding the usual articulation of its pre-

20

PSLRA pleading standard: "this statement of the standard conceals the complexity and uncertainty that often surround its application. This difficulty in application stems, at least in part, from the 'inevitable tension' between the interests in deterring securities fraud and deterring strike suits. . . . As a result, different courts applying the standard to differing factual circumstances may reach seemingly disparate results." *Id.*, 216 F.3d at 307. Accordingly, we should keep in mind that the legislative history of the PSLRA, while subject to dispute as to whether the congressional intent it reflects was to enhance the Second Circuit's minimum pleading requirements, nevertheless clearly reflects congressional intent to require no *less* demanding a standard. Allegations of motive and opportunity held previously to the PSLRA to be insufficient to allow a proper inference of scienter–*see e.g.*, *Novak*, 216 F.3d at 307; *Greebel*, 194 F.3d at 198 ("mere pleading of insider trading, without regard to either context or the strength of the inference to be drawn, is not enough"); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)–would presumably continue to be insufficient. What must be alleged is not motive and opportunity as such but particularized facts giving rise to a strong inference of scienter. Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but it would seem to be a rare set of circumstances indeed where those allegations alone are both sufficiently persuasive to give rise to

21

a scienter inference of the necessary strength and yet at the same time there is no basis for further allegations also supportive of that inference. We conclude that simply because motive and opportunity is alleged does not of itself automatically and categorically mean that the necessary strong inference of scienter is present. Whether motive and opportunity allegations will *ever alone* suffice should in most cases be a moot point.

D. Pleading misrepresentations with particularity

In addition to the requirement that the plaintiff "state with particularity facts giving rise to a strong inference" of scienter, the PSLRA also requires the plaintiff to identify specifically the alleged misrepresentations and/or misleading omissions:

> "In any private action arising under this chapter . . . the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts upon which that belief is formed." 15 U.S.C. § 78u-4(b)(2).

The effect of the PSLRA in this respect is to, *at a minimum*, incorporate the standard for pleading fraud under Fed. R. Civ. P. 9(b). *Greebel*, 194 F.3d at 193. This statutory language appears to comport with this Court's relatively strict interpretation of Rule 9(b), which requires a plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams*, 112 F.3d at 177. Again, the PSLRA provides

22

that if the complaint does not meet those requirements "the court shall, on motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3).

II. Reliance in Fraud-On-The-Market Cases

A second major question raised in this case relates to determining the element of reliance in a section 10(b)/Rule 10b-5 claim which depends on a fraud-on-the-market theory. In the district court's view, many of the allegedly misleading or false statements in question were not material and were not relied on because this was a fraud-on-the-market case and the statements did not have "a correspondingly favorable impact on Zonagen's share price." The plaintiffs contend that the district court's market movement test is unsound.

Recovery of damages for false or misleading statements under section 10(b) and Rule 10(b)(5) requires, among other things, that the statements have been material and that the plaintiffs have relied on them and as a proximate result suffered damage. *Tuchman*, 14 F.3d at 1067. As we explained in *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117-18 (5th Cir. 1988), *vacated on other grounds sub. nom. Fryar v. Abell*, 109 S.Ct. 3236 (1989):

> "The element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a 'reasonable' investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it *actually* based its decisions upon the defendants' misstatements or omissions. 'Reliance is *causa sine qua non*, a type of "but for" requirement: had

23

the investor known the truth he would not have acted.'
*Huddleston* [*v. Herman and MacLean*, 640 F.2d 534 (5th Cir.
1981), *rev'd in part on other grounds*, 103 S.Ct. 683
(1983)] at 549 (footnote omitted). Thus,

> [c]ourts sometimes consider the reliance
> component of the Rule 10b-5 action to be a
> part of the causation element. In this
> context, the term 'transaction causation' is
> used to describe the requirement that the
> defendant's fraud must precipitate the
> investment decision. . . . On the other hand,
> 'loss causation' refers to a direct causal
> link between the misstatement and the
> claimant's economic loss."

*Id*. at 549 n.24 (citation omitted).[10] Reliance, in other words,

generally requires that the plaintiff have known of the particular

misrepresentation complained of, have believed it to be true and

because of that knowledge and belief purchased or sold the security

in question.

However, in *Basic Inc. v. Levinson*, 108 S.Ct. 978 (1988), the

Supreme Court gave general approval to the "fraud-on-the-market"

theory under which reliance could be rebuttably presumed with

respect to publicly disseminated materially misleading statements

concerning companies whose shares are traded on a well-developed,

efficient market. This rested on two assumptions. First, that

---

[10]We likewise stated in *Abell* that "'The causation requirement is
satisfied in a Rule 10b-5 case only if the misrepresentation touches
upon the reasons for the investment's decline in value." *Id*. at 1117,
quoting *Huddleston* at 549. *See also* 15 U.S.C. § 78u-4(b)(4) (added by
the PSLRA):

> "In any private action arising under this chapter, the
> plaintiff shall have the burden of proving that the act or
> omission of the defendant alleged to violate this chapter
> caused the loss for which the plaintiff seeks to recover
> damages."

24

"the market price of shares traded on well-developed markets reflects all publicly available information," or as *Basic* put it in an appended footnote, "we need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id*. at 991 & n.24. And, second, that "the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Id*. at 991. As we stated in *Abell*, in such a case "courts should presume reliance . . . because most . . . investors have relied upon the accuracy of a fraudulently distorted market price." *Id*. at 1120, citing *Basic*. *Basic* plainly states that the presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Id*. at 992. This would include a showing that "the market price would not have been affected by" the alleged "misrepresentations," as in such a case "the basis for finding that the fraud had been transmitted through market price would be gone." *Id*.

In *Abell* we observed that *Basic* "essentially allows each of the circuits room to develop its own fraud-on-the-market rules." *Abell* at 1120. We then went on to look to our prior precedent and concluded that where there are culpable material nondisclosures respecting shares traded on a well developed market, the plaintiff could recover under the fraud-on-the-market theory "if he could

25

prove that the defendant's non-disclosures materially affected the market price of the security."  *Id*. at 1120-21.[11]  It is clear that a fraud-on-the-market theory may not be the basis for recovery in respect to an alleged misrepresentation which does *not* affect the market price of the security in question.

The district court concluded that plaintiffs, having pled only a fraud-on-the-market theory, could not recover as to many of the claimed misrepresentations, including all those after April 1, 1996, respecting the Phase II trials, because the complaint reflected that those claimed misrepresentations did not affect the price of Zonagen shares and hence that they "were not material and that plaintiffs did not rely on them."  The court's discussion of this question, however, focused almost entirely on materiality.  In this regard, the court relied principally on *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997). There, the Third Circuit observed that the fraud-on-the-market theory, on which that suit was grounded, "accords . . . a rebuttable presumption of reliance if plaintiffs bought or sold their securities in an efficient market," "the presumption of reliance [being] based on the theory that in an efficient market the misinformation directly affects the stock prices at which the

---

[11]*Abell* ultimately held that the fraud-on-the-market theory was unavailable there because the securities at issue were not traded on an efficient market.  *Id*. at 1122.  We hence required proof of actual, individual reliance.  *Id.* at 1123.

investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *Id*. at 1419 n.8 (citing *Basic*).[12] The court then held that because the corporation's July 29, 1994, disclosure of disappointing sales information had "no appreciable effect on the market price" of its stock, the annual report's failure to disclosure the same information was immaterial and hence not actionable. *Id*. at 1425. The court explained as follows:

> "In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. *Cf. Shaw [v. Digital Equipment*, 82 F.3d 1194 (1st Cir. 1996)], 82 F.3d at 1218 (in cases involving the fraud on the market theory of liability, statements identified as actionably misleading are alleged to have caused injury, 'not through the plaintiffs' direct reliance upon them, but by dint of the *statements' inflating effect on the price of the security purchased')* (emphasis added) . . ."[13]

While we agree with *Burlington* and the district court as to the requirement, in cases depending on the fraud-on-the-market theory, that the complained of misrepresentation or omission have actually affected the market price of the stock, we conclude that

---

[12]*Burlington* goes on to state: ". . . in order to avail themselves of the fraud on the market theory and the benefit of not having to plead specific reliance on the alleged misstatement or omission, plaintiffs have to allege that the stock in question traded on an open and efficient market." *Id.*

[13]More recently, the Third Circuit reiterated and again applied this aspect of its *Burlington* materiality holding in *Oran v. Stafford*, 226 F.3d 275 at 282-83 (3d Cir. 2000), a Rule 10(b)(5) class action (which, being a class action, necessarily depended on the fraud-on-the-market theory, *see Basic*, 108 S.Ct. at 989).

it is more appropriate in such cases to relate this requirement to reliance rather than to materiality. That is how both *Basic* and *Abell* approach the matter. We also agree with *Burlington* and the district court that although there is generally a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market, the presumption is rebuttable, and where the facts properly considered by the district court reflect that the information in question did not affect the price of the stock then the district court may properly deny fraud-on-the-market based recovery.

III. Phase II trials

The complaint proceeds on the basis of a fraud-on-the-market theory. It alleges:

> "104. At all relevant times, the market for Zonagen common stock was an efficient market for the following reasons, among others:
> a) At all relevant times during the Class Period, Zonagen's common stock was listed and actively traded on the NASDAQ Small Cap Market, a highly efficient market, . . .
> b) As a registered and regulated issuer of securities, Zonagen filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;
> c) Several financial analysts covered and reported on Zonagen's developments, including analysts with Harris Webb & Garrison, Moody's, Volpe Brown Whelan & Co., Asensio & Co., and Raymond James & Associates.
> 105. As a result of the above, the market for Zonagen securities promptly digested current information with respect to Zonagen from all publicly available sources and reflected such information in Zonagen's stock prices. Under these circumstances, all purchasers of Zonagen

28

stock during the Class Period suffered similar injury through their purchase of securities at prices which were artificially inflated by the Defendants' manipulative activities. Thus, a presumption of reliance applies."

The complaint also includes a graph showing the daily trading volume, and the high ask, low bid and closing price of Zonagen shares from February 7, 1996, through the close of the class period. The price per share rose from $12 3/8 on February 7, 1996, to $16 on March 13, 1996, and this price movement is circled on the graph and is accompanied by a notation there stating "Defendants' misrepresentations concerning the Phase II trial results artificially inflate ZONA's share price." The complaint elsewhere also specifically alleges concerning the statements made February 7 and 14, and March 5 and 14, 1996, that "[t]he Defendants' false and misleading statements concerning the results of the Phase II trials had the intended effect: Zonagen's share prices climbed from $12 3/8 on February 7, 1996 to $16 on March 13, 1996." The price per share also rose from 17 3/8 on May 23, 1997 to 24 ½ on May 27, 1997 and thereafter to 32 1/4 on July 18, 1997, and ultimately to a class period high of 44 3/8 on October 13, 1997, and this price movement is also circled on the graph and is accompanied by a notation there stating "Defendants issue a series of misrepresentations concerning the efficacy of Vasomax and the company's intellectual property rights to Vasomax." The price per share fell from approximately $40 November 17, 1997 to close at 13 15/16 on January 12, 1998, the first trading day following the end

29

of the class period, and this price movement is likewise circled on the graph and is accompanied by a notation there that "the market digests Asensio's revelations," obviously referring to the Complaint's allegations concerning a "strong sell" recommendation for Zonagen stock and accompanying report issued November 18, 1997 by Asensio & Co., an institutional investment banking company, and a similar Asensio report issued January 9, 1998. These are the only indications on the graph of any effect of any public disclosures on the price of Zonagen stock. Apart from the graph, the Complaint also elsewhere alleges that as a result of the November 18, 1997 and January 9, 1998 Asensio reports "Zonagen's share prices tumbled, falling from a class period high of 44 3/8 on October 13, 1997 to a low of 13 1/4 on January 12, 1998," and that:

> "Following the announcements in which the Defendants misrepresented and omitted material facts concerning the Phase III clinical trials for Vasomax and the results of those trials, Zonagen's share prices responded highly favorably, closing at $24 ½ on May 27, 1997 (the day of the first announcement of the Phase III results), up from $17 3/8 on May 23, 1997 (the last trading day before the announcement). On July 18, 1997, after no further material news announcements, the Company's shares closed at $32 1/4."

These are the only allegations in the Complaint as to the affect on Zonagen share prices during the class period of any one or more particular alleged misrepresentations by defendants.[14]

_____

[14]The Complaint's allegations as to the affect of publicly disclosed information on Zonagen share prices after the class period are only the following: that the March 27, 1998 announcement that the FDA had approved Pfizer's Viagra for prescription sales "caused . . .

The district court concluded that the allegedly misleading statements concerning the Phase II trials made by defendants in May, June, July and on August 2, 1996 were not material and were not relied on by plaintiffs because the Complaint reflects that "throughout May, June, July and August of 1996 Zonagen's share price did not rise, but instead fell steadily until reaching an all-time low of less than $10 per share in early August" and "plaintiffs fail to allege" that these "statements had a correspondingly favorable impact on Zonagen's share price," and "because plaintiffs' complaint demonstrates that these statements did not have a favorable effect on Zonagen's share prices." We agree with the district court, particularly as to the May 9 and 16, 1996, statements, the first strongly implying and the latter expressly stating that the Phase II results were statistically

[Zonagen's] share prices to rise *temporarily* . . . simply [as] a reaction to the media sensation surrounding the approval of Viagra," and, that as a result of adverse public reports by analysts in early June 1998 "Zonagen's share prices tumbled again, falling from 36 3/4 on June 2, 1998 to 24 3/4 on June 12, 1998."

As previously observed, the Complaint and its attachments reflect that the average closing price for Zonagen shares during the 90 days following the end of the class period (January 9 through April 10, 1998) was $20 1/5. It likewise appears that prior to April 10, 1997, the stock had never traded as high as $20 a share, and that it never traded that high during the portion of January 1998 prior to the close of the class period. Cf. 15 U.S.C. § 78u-4(e)(1) (added by the PSLRA) (damages may not exceed difference between plaintiff's purchase (or, where appropriate, sale) price and the mean trading price during the 90 day period beginning on the date information correcting the complained of misstatement or omission is disseminated to the market).

31

significant.[15]  The Complaint alleged that on November 14, 1996, Zonagen filed its Form S-3 with the SEC which stated that:

> ". . . while Phase II clinical trial provided the Company with what is expected to be the optimum dose for future development, it did not provide the Company with the necessary p-value required to prove statistical significance.  There can be no assurance that VASOMAX (TM) will prove to be safe or effective at the current dose to be tested, or that VASOMAX (TM) will be approved by the FDA for any indication."[16]

So far as the Complaint reflects, at no time subsequent to May 16, 1996, were there any statements to the effect that the Phase II trials produced statistically significant results or data.  There is no allegation in the Complaint that the November 14, 1996, S-3 filing resulted in any decrease in the price of Zonagen stock, and the graph in the Complaint indicates that it did not.  The district court noted that the stock "climbed steadily from below $10 per share in late December 1996 to approximately $18 per share on March

---

[15]As to the other statements during this period (through early August 1996) respecting the Phase II trials, we conclude that in any event the particulars in which these statements were false or misleading were not adequately pled, that otherwise the statements were at most mere optimistic generalizations consisting of "the type of 'puffing' that . . . [the] circuits have consistently held to be inactionable," *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996), and that circumstances giving rise to the requisite "strong inference" of scienter in respect to those statements concerning the Phase II trials were not pled.  We also so conclude with respect to the statements concerning the Phase II trials in the March 31, 1997 Form 10-K (the only other complained of statement concerning the Phase II trials), filed well after the November 14, 1996 Form S-3 disclosed that the Phase II trials results were not statistically significant.

[16]This statement was in the text on the fifth page of the 20 page (exclusive of exhibits) Form S-3 and appeared as a part of the slightly less than one page discussion under (and on the same page as) the all capitalized heading "Uncertainties Related To Clinical Trial Results."

32

18, 1997." Plaintiffs do not challenge these calculations or contend that the November 14, 1996 S-3--with its express disclosure that the Phase II trials did not produce statistically significant results-adversely affected the price of Zonagen shares.[17]

Given that Zonagen shares did not rise, but rather declined, throughout the same five months following the May 9 and 16, 1996, press releases indicating and stating that the Phase II trial results were statistically significant, and did not further decline, but rather rose throughout the several months following the November 1996 SEC filing disclosing that those trials did *not* have statistical significance, and since there is no allegation either explaining this or asserting that those May 1996 representations were ever repeated or that they affected the price of Zonagen stock, we conclude that the district court properly

---

[17]It appears that Zonagen stock closed at or above $12 3/8 from January 26, 1996 through February 7, 1996, the first day of the class period, when it also closed at $12 3/8. The highest close between February 7 and March 15, 1996 was $17 1/4 on March 5, 1996. It closed at $16 on March 13, at $13 3/8 on March 14, and at $12 3/8 on March 15, 1996. After March 15, 1996, the stock steadily declined and did not again close as high as $12 3/8 until January 15, 1997, when it closed at $12 ½. On May 8, 1996, the day before the May 9, 1996, press release, the stock closed at $10 ½ and never again closed higher than that until December 2, 1996, when it closed at $11 ½.

The SEC Form S-3 was filed November 14, 1996. On November 12, 13, and 14, 1996, the stock closed at $9 1/4; on November 15 through 22 it closed at $8 7/8, and the next two trading days at $9 and $8 3/4; thereafter and through December 10, 1996, it closed at or above $9 1/4; from December 11 through December 20, 1996, the closing price ranged from $8 7/8 on December 11 and 13 to a low of $8 1/8 on December 18, rising again to $9 1/8 on December 20, 1996. Thereafter and through the filing of the complaint, the stock has always closed above $9 1/4; indeed has always closed above $13 3/4 since January 1997.

33

determined that those May 9 and 16, 1996, representations were not actionable under a fraud-on-the-market theory.

Plaintiffs argue that the district court erroneously required that the statements be "followed by an immediate rise in share prices." We reject this contention. Five months is considerably more than "immediate." Further, there was no decline following the November 1996 SEC Form S-3 filing. Moreover, plaintiffs pleaded that the "market . . . *promptly* digested current information with respect to Zonagen from *all* publicly available sources and reflected such information in Zonagen's stock prices" (emphasis added). Plaintiffs also argue that the district court's holding is in conflict with our decision in *Abell* because there we held that the fact that there was no significant adverse affect on price when the facts concealed on the initial offering were disclosed two or three years later did not preclude a finding that the non-disclosure was *material* as respects the initial offering. *Id.*, 858 F.2d at 1116-17. However, *Abell* was *not* a fraud-on-the-market case, for we there held that the market was not a sufficiently efficient one for that purpose, and hence we required proof of *actual reliance* by the specific individual plaintiffs. *Id.* at 1119-23. We are not here addressing materiality, certainly not in a case not based on the fraud-on-the-market theory; we are only addressing reliance in a case resting on the fraud-on-the-market

34

theory, and we do not otherwise address reliance.[18] Materiality is determined by evaluating whether there is "[a] substantial likelihood that" the false or misleading statement "would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Basic*, 108 S.Ct. at 983. Materiality thus looks to likely potential. Reliance, on the other hand, ultimately looks to what *actually* happened. *Abell*, 858 F.2d at 1118. If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement. We also realize that in certain special circumstances public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change. For example, if the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed

---

[18]Similarly, inapposite is our decision in *Justin Industries, Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.6 (5th Cir. 1990). *Justin* was speaking to materiality, not reliance, and it was *not* a fraud-on-the-market case. Moreover, it dealt with proxy solicitation where the test for materiality is *not* the likely potential for affect on *the market price* but rather whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding *how to vote*." *TSC Industries, Inc. v. Northway, Inc.*, 96 S.Ct. 2126, 2132 (1976) (emphasis added). *See also Johnson v. Sawyer*, 47 F.3d 716, 737 n.44 (5th Cir. 1995) (en banc) (information as to director's prior conviction must be included in proxy statement if it is material to an evaluation of his integrity, even if not material to deciding whether to invest in the company).

earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall). However, no such special circumstance is alleged or even hinted at here. Moreover, here, after the May 9 and 16, 1996, press releases stating (or clearly implying) that the Phase II trial results were statistically significant, the stock's price *fell* to only slightly over half its price just before the statements were made and likewise significantly below its price at the opening of the class period; *and* after the November 14, 1996 Form S-3 reflected that the Phase II results were *not* statistically significant, the price of the stock *rose* and after December 20, 1996 never again during the class period or prior to the filing of the complaint closed as low as what it had closed at on each of the three days just prior to the filing of the S-3.

The district court did not err in holding that the complaint's allegations as to statements concerning the Phase II trials were insufficient.

IV. Phase III Trials and the "Improved Formulation" of Vasomax

The complaint alleges that the Phase III trials were "materially flawed" such that their reported positive results were unreliable. These alleged flaws included faulty randomization of participants, pre-screening participants to exclude those suffering from side-effects, conflicts of interest in those operating the

36

test centers, and the existence of severe side effects. The allegations about the Phase III statements suffer from a lack of required specificity, either in pin-pointing the particular misleading statement (other than general statements that the Phase III results were "positive") or identifying with any degree of detail how these shortcomings impacted the trials. Moreover, it is well-established that generalized positive statements about a company's progress are not a basis for liability. *See Lasker v. New York Elec. & Gas. Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (observing that "broad, general statements" are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable").

Similarly, the plaintiffs' allegations regarding statements by the defendants that Vasomax was a "fast-acting," "improved formulation" for delivering phentolamine fail because they identify nothing more than inactionable "puffing." Even though Vasomax's potential commercial viability is material, these statements are little more than optimistic generalizations, and therefore cannot support the plaintiffs' claim. *See Lasker*, 85 F.3d at 59.

Moreover, the "facts" pled "with particularity" are inadequate to give rise to the necessary "strong inference" of scienter with respect to the statements concerning the Phase III trials. Under the PSLRA it is clear that conclusory allegations of state of mind do not suffice for this purpose, as we have indeed held in cases governed by pre-PSLRA law.

37

*See, e.g., Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996); *Melder*, 27 F.3d at 1104; *Tuchman*, 14 F.3d at 1069. Moreover, "where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study. Medical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols." *Padnes v. Scios Nova Inc.*, 1996 WL 539711 at *5 (N.D. Cal. 1996). *See also In Re Medimmune, Inc. Securities Litigation*, 873 F. Supp. 953, 966 (D. Md. 1995) (same); *In Re Biogen Securition*, 179 F.R.D. 25, 38 (D. Mass. 1997) (citing *Padnes* and *Medimmune* with approval in this respect).

The instant allegations of motive and opportunity are likewise insufficient. We agree with the district court that the allegations that corporate officers and directors would benefit from enhancing the value of their stock and/or stock options and that the corporation would benefit by receiving more for its shares to be issued in the July 1997 public offering are likewise insufficient to support a strong inference of scienter. We so held in the pre-PSLRA decisions in *Melder*, 27 F.3d at 1102 (alleged inflation of stock price to "successfully bring to fruition the [public] offerings" and to "enhance the value of . . . [officer or director] holdings and options") and *Tuchman*, 14 F.3d at 1068-69. *See also Acito v. Imcera Group Inc.*, 47 F.3d 47 at 54 (5th Cir. 1995).

The only allegation of officer or director trading is that Blasnik,

38

an outside director, sold 62,000 shares on April 25, 1996, at $9.94 a share and 80,000 shares between January 31, 1997, and February 3, 1997, at prices between $16.03 and $16.25 a share. We agree with the district court that these allegations are insufficient. The total sales amounted to about 18.5% of the shares attributable to Blasnik. As to the April 25, 1996, sale, it took place more than a month after the stock began its mid-March 1996 several month steady decline, was at a price well below that at the beginning and at the end of the class period, and is less than a third of what the shares were traded for in the July 1997 public offering and less than a fourth of the October 1997 high. As to the sales between January 31, 1997, and February 3, 1997, we note, as did the district court, that they "took place long after the dissemination of the definitive Phase II results in the S-3 filed on November 13, 1996, and long before the announcement of the preliminary results from the Phase III trials on May 27, 1997," that plaintiffs "do not allege . . . any false and/or misleading statements between November 15, 1996 and March 31, 1997," and that the sales were at "only about half the price to which plaintiffs allege defendants inflated the market based on misrepresentation of the Phase III results in May, June and July of 1997." As the district court correctly observed, "[a]t most plaintiffs allege that one outside director sold a fraction of his holdings at times that were unrelated to any Company announcements and at prices that were far below that which he could have obtained by

39

selling a few weeks earlier or later."[19]  This does not suffice.
"Insider" trading must be "unusual" to have meaningful probative value.
*Acito*, 47 F.3d at 54.  Sales such as Blasnik's which are "so
inauspiciously timed" do not meet this test.  *In Re Apple Computer
Securities Litigation*, 886 F.2d 1109, 1118 (9th Cir. 1989).  Moreover,
"[t]he fact that the other defendants did not sell their shares during
the relevant class period undermines plaintiffs' claim."  *Acito*, 47 F.3d
at 54; *San Leandro Emergency Medical Plan v. Philip Morris*, 75 F.3d 801,
814 (2d Cir. 1996).  This is particularly so given Blasnik's status as
an outside director and the absence of any allegation of sale by any
officer or by any other director.

The district court did not err in holding that the allegations
concerning the Phase III trials were insufficient.

V.  Zonagen's "discovery" of Immumax

Plaintiffs allege that defendants misrepresented that the company
had "discovered" a "new adjuvant" called Immumax.  The representations
in question appear in the April 1, 1996 10K (and are repeated in the May

---

[19]We note there is no allegation that Blasnik sold at a profit.
Plaintiffs have stated both below and on this appeal that the sales by
Blasnik were "through his affiliate, Petrus fund."  We note that the
Zonagen May 14, 1996 proxy statement filed with the SEC reflects that
all but 10,000 of the 845,793 shares attributable to Blasnik were
attributable to him "by virtue of his affiliation with Petrus Fund,
L.P.," and that "Mr. Blasnik disclaims beneficial ownership of the
shares owned by Petrus Fund, L.P."  The May 14, 1997, proxy statement
filed with the SEC likewise reflects that all but 12,500 of the 768,293
shares attributable to Blasnik were attributable to him "by virtue of
his affiliation with Petrus Fund, L.P." and that "Mr. Blasnik disclaims
beneficial ownership of the shares owned by Petrus Fund, L.P."

40

20, 1996 amended 10K), and in the November 14, 1996 S-3, the March 31, 1997 10K, the June 1, 1997 S-3, and the July 22, 1997 Form 424B prospectus. The plaintiffs contend that the statements are false because Dr. Balbir Bhogal, Zonagen's former Director of Immunology, told Podolski before the statements were made that Immumax was not a new adjuvant but rather the same compound of a previously patented product known as Chitosan.

The documents in question all state, at most, that the "Company believes that it has discovered a new adjuvant" which it named Immumax and for which it had applied for a patent in September 1994. None of the documents state that any favorable action had been taken on the patent application or that any product development efforts had been undertaken or planned respecting Immumax. The April 1, 1996 10K also refers to Immumax as a "unique naturally occurring substance which enhances the immune response against weakly immunogenic materials." The November 14, 1996 S-3 additionally states as follows:

"EARLY STATE OF PRODUCT DEVELOPMENT

The Company has not completed the development of any proprietary product, and all of the Company's revenues currently are derived from sales by FTI of products developed or manufactured by others. The development or acquisition of commercially viable products will require significant further investment, research, development, pre-clinical and clinical testing and regulatory approvals, both foreign and domestic. There can be no assurance that the Company will be able to produce at reasonable cost, or market successfully, any such product. Products, if any, resulting from the Company's research and development programs are not expected to be commercially available for several years. Moreover, although the Company has in the past and will continue to seek opportunities for the licensing of existing

41

> product lines in the field of human reproductive healthcare, there can be no assurance that the Company will be able to successfully or profitably market its current or future products under development.
>
> SUBSTANTIAL DEPENDENCE ON ONE PRODUCT
>
> Substantially all of the Company's efforts and expenditures over the next few years will be devoted to VASOMAX (TM). Accordingly, the Company's future prospects are substantially dependent on favorable results of the proposed Phase III clinical trials, approval by the FDA and the successful commercialization of VASOMAX (TM)."

Substantially the same language appears in the March 31, 1997 10K, the June 11, 1997 S-3 and the July 22, 1997 Form 424B.[20] We conclude that there is no "substantial likelihood" that a reasonable investor would consider these statements about a believed discovery whose value was wholly speculative to have "significantly altered the 'total mix' of information" about Zonagen, *Basic*, 108 S.Ct. at 983, and that these statements respecting Immumax were hence immaterial as a matter of law.

The district court did not err in holding that the Immumax allegations were insufficient.

VI. The Zorgniotti patent for Vasomax

Plaintiffs also allege that defendants made misleading statements concerning what is referred to as the Zorgniotti patent and its application to Vasomax. The rights to this patent application were

---

[20]While the April 1, 1996 10K did not include similar express substantial dependence on one product language, such dependence on Vasomax appears evident from the document as a whole. Moreover, as to the April 1, 1996 10K, Zonagen share prices thereafter steadily declined for many months, and did not further decline, but rather rose, following the November 1996 S-3.

acquired by Zonagen in April 1994, the patent was approved in June 1996 and was formally issued October 15, 1996.

The essence of plaintiffs' claim is that the Zorgniotti patent did not cover Vasomax because it was only a method of use patent covering, *inter alia*, phentolamine tablets or other items dissolved in the mouth *but excluding* those swallowed and dissolved in the stomach,[21] and that Vasomax was at all times intended to be administered only as a pill to be swallowed, and was hence affirmatively excluded from the patent so

---

[21]The patent commences by stating that it is "directed to improved methods for modulating the human sexual response by administering vasodilator agents to the circulation of a human via transmucosal, transdermal, intranasal or rectal routes of administration that obviate 'first pass' deleterious effects on such agents." The application subsequently states "when an orally ingested drug reaches the intestine, it is absorbed into the portal circulation and delivered to the liver where it can be metabolized and inactivated. Hepatic inactivation following absorption of a drug from the gastrointestinal tract is referred to as 'first pass' effect . . . and, along with poor absorption and slow transit times through the gastrointestinal tract, functions to require larger oral doses of drugs than may be necessary with other routes of administration. This, in turn, can account for delays in the onset of the therapeutic effect of a drug." Later, the patent states that "[f]or purposes of the present invention, 'transmucosal delivery' generally refers to delivery of the drug to the oral or pharyngeal mucosa and includes buccal delivery, sublingual delivery, and delivery to the pharyngeal mucosa, *but not to the stomach*" (emphasis added). It gives as an example of a delivery covered by the patent "[v]asoactive agents . . . combined in a hard candy (which may be dissolved in the mouth) or in chewing gum to provide buccal or sublingual delivery to the oral mucosa." The patent also states that "[v]asodilating agents useful in the present invention include, but are not limited to, the group consisting of phentolamine mesylate, phentolamine hydrochloride . . . The presently preferred agent is phentolomine mesylate. The presently preferred administrative route is transmucosal, especially buccal."
Vasomax uses phentolomine mesylate as the active pharmacologic agent.
"Buccal" has been defined as "directed toward the cheek;" "of, relating to, involving, or lying within the mouth," ":ORAL." Websters Third New International Dictionary (1981) at 287.

43

that "Vasomax was not covered or protected in any manner by this patent."

The principle basis for plaintiffs' claim in this respect is Zonagen's June 24, 1996 press release stating, as alleged in paragraph 47 of the complaint, as follows:

"47.   On June 24, 1996, the Defendants issued a press release, stating, *inter alia*:

Zonagen, Inc. announced today that it has received notification from the United States Patent and Trademark Office that the *patent covering its use of VASOMAX (TM) as a treatment for erectile dysfunction (impotency) has been allowed.*

The Company noted the *approval was granted for the first of two separate applications associated with VASOMAX (TM).* The second, more recent application is still pending.

'The *approval of our U.S. patent*, the VASOMAX (TM) IND submission and the selection of our Phase III development team are crucial events in our commercialization strategy,' declared Joseph S. Podolski, President and CEO, Zonagen, Inc. . . .

(Emphases added)."

If, as plaintiffs have alleged, Vasomax was at all times intended to be administered only as a pill or tablet to be swallowed and dissolved in the stomach, then it was plainly not covered by the Zorgniotti method of use patent which clearly and affirmatively excluded that method of use. It was hence false and misleading for the June 24, 1996 press release to state that "Zonagen, Inc. announced . . . that the patent *covering its use of Vasomax* (TM) as a treatment for erectile dysfunction (impotency) has been allowed" (emphasis added). The patent *did not* "cover" Zonagen's use of Vasomax, but rather affirmatively

44

excluded that use.[22]

Plaintiffs also complain of subsequent Zonagen statements concerning the Zorgniotti patent, namely statements in its November 14, 1996 S-3, March 31, 1997 10K, June 11, 1997 S-3 and July 22, 1997 Form 424B prospectus.[23] Considered individually, none of these statements can of themselves reasonably be considered false or misleading in the same

_____

[22]We are somewhat concerned that the language from the June 24, 1996 press release as quoted in the complaint differs from the language in the purported copy of the same press release attached (along with numerous other documents) to defendants' motion to dismiss (all such documents being covered by the single affidavit of an attorney with the firm representing the defendants in this litigation that they are true and correct copies). The copy attached to the motion to dismiss states in relevant part that "Zonagen, Inc. announced . . . that the patent covering *the* use of Vasomax (TM) as a treatment for erectile dysfunction (impotency) has been allowed" (emphasis added). The difference is that as quoted in the complaint the press release refers to "its" – necessarily Zonagen's – "use," while according to the copy attached to the motion to dismiss, the press release refers to "the use"–*not* "its use." The district court did not address this discrepancy, nor has it been addressed in this appeal by any of the parties, and the press release is not a document filed with any governmental agency a certified copy of which we could procure; plaintiffs in their brief on appeal continue to quote the language of the press release as set out in the complaint, and defendants in their brief have not asserted that this is not the language used in the press release. We have accordingly proceeded on the assumption that the complaint accurately quotes the language of the press release. The district court on remand should resolve the discrepancy–which conceivably could be relevant to the issues of falsity and scienter–and likewise consider whether any sanctions are called for.

[23]The complaint additionally cites the April 1, 1996 10K which refers to the Zorgniotti "patent application" as being "for the use of phentolamine meyslate ("Phentolamine") as an 'on demand' oral treatment for male impotency," and in a subsequent paragraph states that "Vasomax uses phentolamine as the active pharmacologic agent." No allegations reflect that either statement is false or misleading, and the statements appear to be correct.

manner as the June 24, 1996 press release.[24]  However, the statements cannot be considered by themselves, for the statements in the above referenced June 24, 1996 press release–that the patent covered Zonagen's use of Vasomax–had never been retracted or modified and it had not been disclosed that the Zorgniotti patent did not cover Zonagen's use of Vasomax or did not extend to pills or tablets to be swallowed and dissolved in the stomach as Vasomax was.  Hence, in the absence of other factors, a fact finder could determine that readers of these later statements could reasonably be assumed to have understood them as referring to the patent as described in the June 24, 1996 press releases, so that the representation of that press release was in effect carried forward to March, June and July 1997.[25]

_____

[24]The November 14, 1996 S3 and the March 31, 1997 10K merely refer to the Zorgniotti patent as one "with respect to its [Zonagen's] male impotency technology (Vasomax (TM));" the June 11, 1997 S-3 and the July 22, 1997 Form 424B merely refer to the patent as "relating to Vasomax." The June 11, 1997 S-3 and the July 22, 1997 Form 424B likewise expressly state that the Zorgniotti patent "is a method-of-use patent that covers only the use of certain compounds to treat specified conditions, rather than a composition-of-matter patent which would cover the chemical composition of the active ingredient."  Essentially the same statement is made in the March 31, 1997 10K.

[25]Plaintiffs also complain of the statement in the November 6, 1996 Zonagen press release that "Zonagen has received a domestic patent and has filed international patent applications on the Vasomax formulation," which they allege falsely states that the Zorgniotti patent (the only domestic patent Zonagen then had) is a composition-of-matter patent. However, in the March 31, 1997 10K, the June 11, 1997 S-3 and the July 22, 1997 Form 424B it was clearly stated that the patent was only a method-of-use patent and was not a composition-of-matter patent.  The stock price did not appreciably rise between November 6, 1996 and March 31, 1997, _and_ did not fall, but rather significantly rose, after March 31, June 11 and July 22, 1997, and nothing in the complaint asserts or suggests any explanation for this other than the fact that the November 6, 1996 press release did not affect the price of the stock.  Hence,

46

The district court held that scienter was not adequately pled as to the Zorgniotti patent statements made in 1997, but it considered those statements in isolation and not in light of the never retracted assertions of the June 24, 1996 press release. Although the question is a close one, we conclude that the necessary strong inference of scienter is pled as to Podolski, who was, and had been since July 1992, President and Chief Executive Officer, as well as a director, of the corporation.[26] We recognize that normally an officer's position with a company does not suffice to create an inference of scienter. *Melder*, 27 F.3d at 1103. *See also Advanta*, 180 F.3d at 539. However, there are a number of special circumstances here which, taken together, suffice to support a different result in the present case. To begin with, Zonagen was essentially a one product company, and that product was Vasomax. Thus, the November 1996 S-3, as well as the March 31, 1997 10K, the June 11, 1997 S-3, and the July 22, 1997 Form 424B, all reflect that "[s]ubstantially all of the Company's efforts and expenditures over the next few years will be devoted to Vasomax (TM)", and that "the

---

fraud-on-the-market "reliance" is lacking as to this alleged misstatement.

[26]The June 11, 1997 Form S-3 also reflects that Podolski had joined Zonagen in 1989 as Vice President of Operations. In the 12 years preceding 1989, he had held engineering, product development and manufacturing positions with Monsanto Company, and before that had spent eight years at Abbott Laboratories, Dearborn Chemical Company and Baxter Pharmaceuticals in development of fine chemicals, antibiotics, pharmaceuticals and hospital products.

Proxy statements filed during the class period reflect that he held a bachelor's degree in chemistry and a master's in chemical engineering.

47

Company's future prospects are substantially dependent on" Vasomax. *See Advanta*, 180 F.3d at 539 (citing case in which scienter inference adequately supported by fact that the contract in question "'was undeniably the most significant contract'" in the company's history). Further, patent protection for Vasomax was obviously important. The June 11, 1997 S-3 states that "[t]he Company's ability to compete effectively with other companies is materially dependent on the proprietary nature of the Company's patents and technologies," and in the June 24, 1996 press release Podolski is quoted as describing the approval of the Zorgniotti patent as a "crucial event[s]."[27] Additionally, the Company had acquired the Zorgniotti patent application in April 1994, so there was ample opportunity to become familiar with it prior to June 1996. In this connection, we also note that the Company is not large. As reflected by its 10K's filed April 1, 1996 and March 31, 19979, the Company had only thirty-two full time employees in January 1996 and only thirty-five in January 1997. Finally, the Company's June 24, 1996 and November 6, 1996 press releases, which describe the Zorgniotti patent, both quote Podolski, and an article in the issue of *Fortune* distributed in mid-February 1998, states: "[i]n a

---

[27]The Zorgniotti patent was the Company's only patent approved or issued during the class period which was claimed to relate to Vasomax. There was another patent application (the Lowrey patent) pending during the class period but it was not granted until March 25, 1998 (it was both a formulation and a method-of-use patent). Indeed, as Zonagen reported in its November 1996 S-3, the Lowrey patent had been rejected in a non-final first office action by the United States Patent and Trademark Office. The Company's subsequent class period filings all state there was no assurance the Lowrey patent would be granted.

48

recent interview, Podolski concedes, 'You can say today no patent specifically covers Vasomax;' he claims the company's issued patent 'broadly covers' the drug."

Taking all the above factors together we conclude that they suffice, if perhaps only barely so, to support the necessary "strong inference" of scienter on the part of Podolski and Zonagen with respect to the statement that the Zorgniotti patent covers Zonagen's use of Vasomax.[28] The result, however, is otherwise as to Blasnik and Sutter, both of whom were outside directors, neither of whom is alleged to have made any statements or issued any press release about any patent (or Vasomax itself), and as to neither of whom is any other allegation made tending to support an inference of scienter in this respect. As previously noted, the stock sales attributable to Blasnik are wholly insufficient for this purpose.[29]

---

[28]Nothing in our opinion on this issue should be read as precluding pre-trial judgment against the plaintiffs in the event of fuller development of contextual facts. For example, our conclusion on this issue is made in the context of the allegation that Vasomax was always intended only as a pill or tablet to be swallowed and dissolved in the stomach. Should this not be the case and should Vasomax have been intended also (or alternatively) to be administered in a way compatible with the Zorgniotti patent–such as being dissolved in the mouth–or if it was believed by Zonagen to be readily adaptable to that method of administration, then a different question would be presented. *See also* note 22, *supra*.

[29]Because the district court ruled that no violation of § 10(b) had been adequately pled as to Zonagen (or any other party), it further ruled that accordingly there could be no secondary liability of any of the individual defendants as "controlling persons" of Zonagen under § 20(b) of the Exchange Act, 15 U.S.C. § 78+(a). *See Shields v. Cityhurst Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994). However, we have held that the complaint adequately pleads § 10(b) liability as to Zonagen

49

## Conclusion

We have held that with one exception the district court did not err in holding that the allegations of the complaint were insufficient.

However, we have also held that the district court did err in holding insufficient the allegations of the complaint with respect to Zonagen having stated that the Zorgniotti patent covered Zonagen's use of Vasomax, so far as concerns Zonagen and Podolski, and in failing to address the potential section 20(a) liability of Blasnik and Sutter in that particular respect.[30]

We accordingly vacate the district court's judgment of dismissal and remand for further proceedings not inconsistent herewith.

VACATED and REMANDED

_____

(and Podolski) with respect to the statement that the Zorgniotti patent covers Zonagen's use of Vasomax. Accordingly, on remand the district court will likely need to address the potential § 20(a) liability of Blasnik and Sutter in respect to that statement.

[30]Plaintiffs also complain of the district court having dismissed the complaint with prejudice without affording them an opportunity to (again) amend the complaint. However, at no time, either before or after the judgment dismissing the action, did plaintiffs ever indicate to the district court that they desired (or would desire, in the event of dismissal), to amend the complaint; nor did they file any post judgment motion in the district court. *See, e.g., Martin v. Scott*, 156 F.3d 578, 580-81 (5th Cir. 1998); *Whitaker v. City of Houston*, 963 F.2d 831 (5th Cir. 1992). On remand, plaintiffs may submit a request to amend and if they do so the district court is the appropriate venue to address in the first instance whether to allow a requested amendment.